Withers, J.
delivered the opinion of the court.
The points raised for our decision in this case are—
1. Had the defendant the right to enter the plaintiff’s enclosure to seize the cattle and hogs, alleged to be subject to such seizure and to forfeiture?
2. Was the exclusion of verbal instructions by a magistrate to Jared N. Cantey, with whom the defendant was confederated in the transaction, error in the circuit court?
3. Are the damages so far excessive as to warrant the interference of this court in granting a new trial ?
We are not ignorant that the determination of the first question carries with it an interest to the community, as well as to the parties in this litigation — and, therefore, we have endeavored to derive, from the argument at the bar and research into the series of our Provincial systems of slave-law, whatever light was attainable upon the subject. Though the codes of law for the government and regulation of slaves, of a date prior to 1740, have expired by the terms of their own limitation, they are, nevertheless, sources from which some light may be borrowed, and reflected upon the pro *5 visions of the latter code, which, in its main features, exists to the present day, by virtue of a reviving Act m 1783.
Stat- p' 409‘
By the 34th section of the Negro Act of 1740, an evil is declared to exist in permitting slaves to keep canoes, and to breed and raise horses, neat cattle and hogs, and to traffic and barter for the particular and peculiar benefit of such slaves, thus gaining a facility to receive stolen goods,7 and to confederate and conspire for insurrection. It was, therefore, enacted that it should not be lawful for any slave to buy, sell, trade, traffic, deal or barter for any goods or commodities — “ nor shall any slave be permitted to keep any boat, perriauger or canoe, or to raise and breed, for the use and benefit of such slave, any horses, mares, neat cattle, sheep or hogs” — upon pain of forfeiture of all goods arid commodities for which he may have trafficked, and oí such specified articles and stock — “ which any slave shall keep, raise or breed for the peculiar use, benefit and profit of such slavethen follows the particular clause which is material in this case, as follows; — “ and it shall and may be lawful for any person or persons whatsoever, to seize and take away from any slave all such goods, commodities, boats, perri-augers, canoes, horses, mares, neat cattle, sheep or hogs, and deliver the same into the hands of any of his Majesty’s Justices of the Peace nearest the place where the seizure shall be made” — whereupon, the Justice is to ascertain, on oath of the party seizing, the manner thereof, and if found to be done legally, the goods so seized are to be forfeited and sold at auction, subject to a proviso in favor of reclamation, under an oath specified to be. taken by one who may have a right to, or the lawful custody of, such goods. The oath prescribed is in the words following. “ I do sincerely swear that I have a just and lawful right or title to certain goods seized and taken by C. D. out of the possession of a slave named-; and ' I do sincerely swear and declare, that I did not, directly or indirectly, permit or suffer the said slave, or any other slave whatsoever, to use, keep or employ the said goods for the use, benefit, or profit of any slave whatsoever, or to sell, barter or give away the same; but that the same goods were in the possession of the said slave by theft, finding or otherwise, or to be kept bona fide for my use, or for the use of E. F, a free person, and not for the use or benefit of any slave whatsoever.”
The question is, had Broughton the right to enter the plaintiff’s close to seize, as he did, the stock captured on the occasion ?
We think he had not; and, therefore, that in this very material particular, the charge was more favorable to him than the law warranted. We are to be understood as holding this proposition, even though it be assumed that the *6 cattle and hogs were such as come under the condemnation 0f the statute.
7 Stat¡ 3G8.
7 Stat. 382.
7 Stat. 394.
The earliest period at which the legislative policy in quest¿on js foun(j t0 have been adopted, was in 1714, when the owner of a slave was forbidden to allow him to plant for himself any corn, peas, or rice, or to keep for himself any stock of hogs, cattle or horses, under a penalty upon the master¡ t0 pe recovered by qui tam action.
The form which this policy next assumed, is found in the Act of 1722, sec. 35, where the inconvenience was alleged to arise from the danger of insurrection, by reason of slaves being permitted to keep and breed horses. Then it was required of any justice of the peace who, from personal knowledge or from information, should ascertain that any slave kept any horse or neat cattle, that he cause the same to be taken away and sold. And it was declared lawful for any person to seize hogs kept by slaves, and all boats and canoes belonging to them, and give notice to the next justice.
In the first mentioned Act, it is manifest that no entry upon the premises of the owner of a slave offending in the particular specified was at all permissible or in contemplation. In the second Act mentioned, the right so to enter by the justice or his constable, is by no means clear; and it is to be remarked that, in regard to horses and neat cattle, the justice alone^ could deal with them.
In 1735, the law of 1722 was re-enacted, in substance, but the mode was specified there, to wit: — a justice should empower, by warrant, a constable to take away and sell the horses or neat cattle. Asubefore, any person might seize the hogs, boats or canoes. But the 32d sec. at page 395, affords a ray of light to the question. It enacts “ that every person who shall send any slaves with perriaugers, boats or canoes, shall give them a ticket.” Then we reasonably infer that the capture permitted, in regard to the water craft, was expected to occur beyond the eye and premises of the master.
The next step was the Act of 1740; which has been heretofore quoted in substance.
According to the scheme of that, our existing, law, it will be seen that the power vested in a justice of the peace from 1722, in relation to horses and neat cattle, was denied to that officer, and the right of seizure, by a private person, was extended not only to them, but to a vast range of other articles of property, to wit: — to any goods or commodities that a slave had acquired by selling, trading, dealing, trafficking or bartering, except in cases permitted, as well as to boats, per-riaugers, canoes, horses, mares, neat cattle, sheep and hogs. Now if it be insisted that, under previous legislation, a magistrate might enter a man’s premises, or authorize another so *7 to do, to confiscate, this power was confined, even when supervised by an officer of the law, to horses and neat cattle; and is it not incongruous to contend, that while this restricted power was withholden from such public officer, by the Act of 1740, the same power (delicate and liable to great abuse when most guarded by discretion) should have been, by design, vested, with a vastly enlarged range of operation, in “ any person ?” It is manifest that, in the whole system of legislation in regard to slaves, the law-making power of Provincial times proceeded with a cautious step; for the several Acts were temporary; as was the case with that of 1740. From such caution the inference is, that earnest attention was paid to the lessons of experience — to practical, developements — from year to year; and that, if magistrates within their limited range, ever did enter, or cause to be entered, the plantations of slave-owners in quest of condemned goods, it had been found to be an injudicious license, even for them, and hence was withdrawn in 1740 — and a fortiori it must have been deemed inexpedient to commit to the hands of any private person an inquisitorial power, pregnant with vexation, oppression and turbulence, and boasting little affinity to some of the most cherished and stable maxims of the English common law.
It is eminently proper, when we are seeking, through the mists of more than one hundred years, the true interpretation of a legislative Act, to resort for aid to such objects of pursuit, as are declared to have been in contemplation by the Legislature, Was it necessary that a man’s plantation, or it may be his negro-houses within the curtilage, should be open to invasion, night or day, as might suit the convenience of a captor, in order to advance the great ends in view? In 1722, the danger was declared to arise from the facility of intercourse between different parts of the country, by negroes upon horses of their own, whereby insurrections might be hatched and matured. While it might be well, therefore, to subject to capture a horse ridden by a negro and belonging to him, with no lawful permit, beyond his master’s premises, what harm could come to the public peace and safety if the negro and horse remained on the master’s plantation ? The same remark will apply to water craft. In 1740, to the evil apprehended of dangerous conspiracies, was added that of receiving stolen goods, under guise of the ownership of the several descriptions of slock mentioned: and it should be remarked that, throughout this latter legislation upon the subject, the idea of dealing and trafficking goes pari passu with every other purpose disclosed. Now if one’s goods in specie, — if stock alive — were traced under the cloak which was supposed to be found to cover the reception of stolen goods, in the breeding and raising, by negroes, of the ani *8 mals mentioned, a search warrant was sufficient and acces-g^e t0 any t)0(jy) to detect and reclaim what was lost and could be identified. But the moment these animals were slaughtered or otherwise transported beyond the plantation for barter or sale, then the danger apprehended would become imminent; and even though the sheep, hog or steer should have been bred and raised by the slave, it then became liable to be captured, and then, in the true, legitimate and beneficial sense, any “ person or persons whatsoever,” might '■'■seize and take away from any slave” such article; for the statute had declared it unlawful for him to have bred or raised it, under the penalty of just such a seizure and forfeiture.
It is declared to be unlawful for any slave to barter or traffic for goods or commodities (except under very restricted limits as to slaves residing or usually employed in Charleston) and these goods and commodities are liable to seizure precisely as the live stock mentioned. It is an argument to ask whether it ever was designed, or could now be tolerated, that a man’s enclosure should be invaded, perpetually it might be, by private persons with no process of law, to hunt up and capture every mackerel, pound of sugar, yard of tape, or bottle of molasses that might be unlawfully acquired by one of his slaves ?• Such a rule of law, diligently enforced, could have but a short and turbulent existence — or if it triumphed, it is much to be apprehended it would triumph over many at least of our opinions touching the value of the institution of slavery. We are glad to find no cogent and sound rules of interpretation that drive the country to such a result or hazard; none that might serve to place the police of the slave-owner’s domain under that species of vigilance that, too often, might be quickened less by a reverence for the law, than by a covetous craft or a restless malice.
By-confining this right to the sphere which has been prescribed, there does seem to be a more prudent, rational and natural execution of the purpose, which is — “ to seize and take away from any slave,” an article contraband, bred, raised or acquired, “for the particular and peculiar benefit of such slaveor, (as elsewhere expressed in the Act) “ for the peculiar use, benefit and profit of such slave.” It is not quite apparent, when a slave raises a hog by his master’s leave, and kills and eats it, or divides it among the inmates of his cabin, with his master’s knowledge — or when he builds a canoe and fishes, by its aid, in his master’s mill-pond — that this, in propriety of language, looking either to the force of words or the dictates of policy, shall be said to be for the “peculiar use, benefit and profit” of the slave. For if he lived the better, his master’s benefit might also be found in that, seeing that the honest diligence of the slave had not corrupted his morals or disturbed the public peace, and the *9 draft on the owner’s supplies might be so much the less. And so of many other examples that might be mentioned.
345. vide Act of I69(f 7_Stat.
It was urged by counsel, and suggested by the circuit Judge, that the right of entry was incident to the power to seize. There might have been some force in this view, if it had been urged in defence of a magistrate or constable, at a time when either or both might have acted under the peremptory commands of the Acts of 1722 and 1735; but even in that case it might have been well answered, that such reasoning begged the question ; for the inquiry is, and would .then have been, was it ever required that the seizure should be made on the owner’s premises ? The argument loses all its force as to private individuals acting under the law of ,1740, for they are required to do nothing. The power is one of permission merely.
A view may be gained as to this right to enter the close from another branch of the slave law. There has ever been, and is now, a lively jealousy as to the possession and use of fire-arms and other deadly weapons by slaves — andas to suspicious congregations of them in any place. It will be found that while, in more ancient times, masters were required, once in every month, to search the habitations of their own slaves; in later times, when this search for weapons was to be made, or these assemblages to be supervised and dispersed, the law invokes its own agents, and prescribes its own accustomed forms. Now when we perceive that in the same code, and in more hazardous times, the private arm is fettered, in this great, universal and truly public concern, shall we, at this day, incline to unbind, to invigorate and encourage it in the violation of private domain, when the object is merely to capture, for the fortuitous gain of one who never labored for them, domestic animals, goods and commodities?
It may be seen that, in 1712, (when the code was far more stringent than at later limes) the right to capture any fire arms by any person, found in possession of a negro, was to be exercised only when such slave was apprehended with the weapon, without a ticket and out of the limits of his master’s plantation. (See upon the same subject, sections 3 and 5 of Act of 1722, 7 Stat. 272 — and sec. 4 of Act of 1735, 7 Stat. 386-7.)
We may be permitted to look at this question from a more elevated position. In the preamble to three several Acts preceding that of 1740, we may find the temper of the times, arising, no doubt, from the greater rudeness of the institution of slavery, attributable, it may be, as well to the comparative inexperience of owners as to the fierce nature of newly imported Africans. Accordingly we Have it on the front of the Acts passed from 1714 to 1735, both inclusive, *10 that slaves were of a nature too barbarous, wild and savage to be fit for the mild sway of the common law — yet we do not find, within that period, full, as it manifestly was, of solicitude concerning the tendency of slaves to insurrection-ary ideas and plots, any instance, wherein the sanctity of the private domain' was opened to the intrusion of unofficial persons. Magistrates, constables or patrols, with a suitable posse, where that was needed, were alone to pry into the proceedings or purposes of suspicious clubs or confederacies of slaves, and were alone to make search for deadly weapons. When we reach 1740, we enter a milder light and more tranquil atmosphere, and are met at the threshold with the evidence that time had worked its amelioration — and it is most agreeable to know, that, in the long period of intervening time, the persuasions of domestic sympathies, the steady light of moral example, the more enlightened dictates of self-interest,, the tremendous power of the Christian religion, have worked, with eminent success, their transforming influences upon both races. We read in the language of 1740, as follows : “ Whereas, in his Majesty’s plantations in America, slavery has been introduced and allowed, and the people commonly called negroes, Indians, mulattoes, and mestizoes, have been deemed absolute slaves, and the subjects of property in the hands of particular persons, the extent of whose power, over such slaves, ought to be settled and limited by positive laws, so that the slave may be kept in due subjection and obedience, and the owners and other persons, having the care and government of slaves, may be restrained from exercising too great rigor and cruelty over them, and that the public peace and order of this province may be preserved.” Now the suggestion presents itself — admitting the point presented by the defendant in this case to be dubious — it seems neither judicial, philosophical, nor humane, to roll back the tide of advancing liberality — to supplant, by the darkness of an earlier day, the light of our own — to introduce into the plantation or homestead of every slave-owner a seeker after waifs, as it were, with an appetite for fortuitous gain whetted into keenness, with a range of police discipline fearfully enlarged, which, in its smallest proportions, had been deliberately withdrawn from a magistrate and constable ; and all this, in the face of reasonable confidence in the plantation police of the owner himself, justified by the immense improvement, in that particular, of modern times. We deem it neither safe, well or necessary to travel towards such a result by the construction of any ancient legislative provision, unless its words, with context conformable, be of the clearest import and the most cogent force.
3 McC. 179.
We find nothing in the case of Clarke ads. Blake, that touches this question. A patrol there made the seizure, and *11 they, of course, might lawfully enter as patrol — though, on circuit, they were held to be trespassers — most probably, however, for taking chattels that proved to be exempt from seizure. Upon that ground the case turned in the Court of Appeals, and our present leading question was not considered.
2. Was the magistrate’s verbal instruction or advice improperly excluded ? It is enough to remark, that inasmuch as he had nothing to do with the capture, the instructions or advice of any body else might as well have been adduced. In addition, it is-not easy to conceive how his advice could have aided the party engaged, any more than the doctrine of the Circuit Judge, which held that they had a right to enter. Nor is it quite clear that any thing he may have said to Can-tey, who was not sued, was available to Broughton who was.
3. As to excessive damages: — -The main foundation of Broughton’s defence has been ruled in this behalf, erroneously, in his favor, according to our opinion, as already has appeared — and he can scarcely expect to fare better, if that proof be withdrawn ; as in a new trial he would find it to be. Nor are we disposed to interfere, in such a case as this, with the appropriate and peculiar function of the jury.
The motion, therefore, is refused.
Richardson,. J. O’Neall, J. I^vans, J. and Frost, J. concurred.

Motion refused.